**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-02501

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DEVELOPMENTAL BEHAVIORAL HEALTH, INC., and
DR. DAVID HATFIELD

      Defendants.

---

## COMPLAINT

---

The United States brings this civil action to recover damages and civil penalties for false claims submitted to TRICARE, the United States military health insurance program, by Defendants Developmental Behavioral Health, Inc. ("DBH"), and Dr. David Hatfield. Dr. Hatfield, a psychologist, is the owner and operator of DBH, a company that provides behavioral therapy to developmentally-disabled children, particularly children with severe autism. TRICARE has supplemented its health insurance coverage through a program called the Extended Care Health Option ("ECHO"), to pay for therapy services for the developmentally-disabled children of military members. From July 2008 through at least March 2013, Dr. Hatfield, through DBH, knowingly and routinely billed TRICARE not for therapy services, but for cancellations and no-shows, time spent performing administrative functions (including "billing for billing"), and for non-allowable materials and supplies. By knowingly (as that term is defined in the False Claims Act) submitting, or causing to be submitted, false or fraudulent claims for reimbursement, Dr. Hatfield and DBH violated the False Claims Act, 31 U.S.C. §§

3729-3733. The United States is also entitled to equitable relief for unjust enrichment, payment by mistake, and disgorgement.

## I.  NATURE OF ACTION

1.  The United States brings this action to recover treble damages and civil penalties under the False Claims Act ("FCA") and to recover damages and other monetary relief under the common law or equitable theories of unjust enrichment and payment by mistake.

2.  The United States bases its claims on Defendants submitting or causing to be submitted false or fraudulent claims to TRICARE in violation of 31 U.S.C. § 3729(a)(1), § 3729(a)(1)(A), and § 3729(a)(1)(B).

3.  Within the time frames detailed in this Complaint, Defendants knowingly (as that term is defined in the FCA) submitted, or caused to be submitted, hundreds of false and fraudulent claims to TRICARE for reimbursement, which resulted in tens of thousands of dollars of payment to Defendants that would not have been paid but for Defendants' misconduct.

## II.  JURISDICTION AND VENUE

4.  This action is brought by the United States under the FCA, 31 U.S.C. §§ 3729-33, and pursuant to common law.

5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

6.  This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the acts that are the subject of the Complaint occurred in Colorado.

7.  Venue is proper in the District of Colorado under 31 U.S.C. 3732(a) and 28 U.S.C. § 1391(b) because the acts that are the subject of the Complaint occurred in Colorado.

## III.  PARTIES

8.  Plaintiff, the United States, brings this action on behalf of the Department of Defense

   ("DOD") and TRICARE.

9.  TRICARE is the health insurance plan for active-duty and retired military personnel and

   their families.  10 U.S.C. § 1074; 32 C.F.R. § 199 *et seq.*

10. Defendant Dr. David Hatfield is a licensed psychologist.

11. Dr. Hatfield currently resides in Monument, Colorado.

12. Defendant DBH is a Colorado corporation, with a principal street address at 1115 Elkton

   Drive, Suite 300, Colorado Springs, Colorado, 80907.  DBH is a provider of

   psychological counseling and therapy, evaluation, research, and therapy services for

   persons with diagnosed with developmental disabilities, including autism.

13. DBH was incorporated by Dr. Hatfield on or about April 3, 2006.  From DBH's

   incorporation through the date of this Complaint, Defendant Dr. Hatfield has been its sole

   owner.

14. During the relevant time period, DBH, its employees, and agents, conducted business in

   Colorado Springs, Colorado.

## IV.  THE FALSE CLAIMS ACT

15. In general, the FCA provides for the award of treble damages and civil penalties for

   knowingly submitting, or causing to be submitted, false or fraudulent claims for payment

   to the United States.  *See* 31 U.S.C. § 3729(a)(1).

16. Section 3729(a)(1) of the FCA provides, in relevant part, that any person who:

   (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for
   payment or approval;
   (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or
   statement material to a false or fraudulent claim; …

\* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 … plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).[1]

17. For purposes of the FCA (both pre- and post-FERA), the terms "knowing" and "knowingly," mean that a person: "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).

18. Proof of knowledge under the FCA "require[s] no proof of specific intent to defraud."  *Id.*

## V.  THE TRICARE PROGRAM

19. The United States, through TRICARE and its contractors, administers the claims, billing, and payment functions of the TRICARE program.  TRICARE is authorized to issue rules, policies, and procedures relating to the administration of TRICARE.

20. The regulatory authority for the TRICARE program is located at 32 C.F.R. §§ 199.1-26.[2]

21. The Defense Health Agency ("DHA," formerly the TRICARE Management Activity, or "TMA"), publishes four TRICARE Program Manuals:  the TRICARE Operations Manual ("TOM"); the TRICARE Policy Manual ("TPM"); the TRICARE Reimbursement Manual ("TRM"); and the TRICARE System Manual ("TSM").  The Manuals are all publicly available on TRICARE's website.

---

[1]   The FCA was amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Public Law 111-21, enacted May 20, 2009.  Given the nature of the conduct at issue, both the pre-FERA and post-FERA versions of Section 3729(a)(1) are applicable to claims in this case.  Current Section 3729(a)(1)(A) corresponds to pre-FERA Section 3729(a)(1), and current Section 3729(a)(1)(B) corresponds to pre-FERA Section 3729(a)(2).
[2]   These regulations reference CHAMPUS.  TRICARE replaced CHAMPUS.

22. The TOM provides operational guidance to TRICARE contractors, and TRICARE contractors are required to follow the guidance provided in the TOM.  *See* TOM, Foreword.

23. The TPM and the TRM "implement[]" the Code of Federal Regulations ("CFR") and "must be used in conjunction" with the CFR "for complete policy information."  *See* TPM, Foreword & TRM, Foreword.  They "provide[] guidance, policy interpretation and decisions implementing TRICARE."  *Id.*

24. The TSM "defines the contractor's responsibilities for automated processing of health care information."  *See* TSM, Foreword.

25. When a health care provider enrolls as a TRICARE provider, the provider must sign a Provider Contract, which includes a provision that the provider must comply with all policies and procedures in the TRICARE Provider Guide, also known as the TRICARE Provider Handbook.

26. The TRICARE Provider Handbook is TRICARE's general publication for providers and provides guidance on its programs, policies, and procedures.  The Provider Handbook informs providers that the CFR, the TOM, the TPM, and the TRM provide direction on how TRICARE administers the law, and that the Manuals can be found online.  *See* Exhibit A-1 at 10 (Excerpt from 2009 TRICARE Provider Handbook, West).

27. The TRICARE Provider Handbook informs providers that it will be updated annually, and that providers can obtain a new copy online or by calling a designated phone number. *See* Exhibit A-1 at 1.

28. The CFR, the TRICARE Manuals, and the TRICARE Provider Handbook all prescribe regulations, rules, and policies for health care providers for billing, claims, and reimbursement of health care services.

29. Health care providers are responsible for knowing TRICARE policies as issued through federal regulations, through notices such as bulletins and national or local coverage determinations, and through community standards of practice.

30. During the time period relevant to this Complaint, the TRICARE contractor responsible for handling Defendants' claims for reimbursement was TriWest.

31. To obtain reimbursement for services covered by TRICARE, providers such as Defendants must submit a standard Health Insurance Claim Form ("CMS-1500").

32. The CMS-1500 requires providers to certify that "the information on this form is true, accurate, and complete," and that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision . . ."

## VI.  GENERAL TRICARE BILLING RULES

33. TRICARE providers may not bill TRICARE for missed appointments.  The 2009 TRICARE Provider Handbook states that "TRICARE does not reimburse charges for missed appointments."  Ex. A-1 at 18.  Moreover, the TRICARE CFR section governing "administrative remedies for fraud, abuse, and conflict of interest" state that "billing or submitting a [TRICARE] claim for an office visit for a missed appointment" is an example of what is "presumed to be fraud."  32 C.F.R. § 199.9(c)(1).

34. TRICARE providers may not bill TRICARE for administrative expenses.  The TRM

states that:

Providers may incur administrative expenses during the course of doing business.  Most of these expenses are normal and payment for them is included in the payments made for the medical services rendered by the provider.  Others are not covered because they are not medical services related to the treatment of an illness or injury.  In either case, separate charges for administrative expenses are not allowed. … Provider administrative expenses such as charges for claims completion, furnishing medical records, etc., are not separately allowable.

TRM, Chapter 1, § 19.

### VII.  APPLIED BEHAVIOR ANALYSIS COVERAGE AND BENEFIT

35. As relevant to this Complaint, TRICARE offers an Extended Care Health Option

("ECHO") that is available to qualifying dependents of TRICARE beneficiaries.  *See* 32

C.F.R. § 199.5.

36. In September 2005, TRICARE began to cover Applied Behavior Analysis ("ABA")

therapy through the ECHO program.

37. Until approximately 2010, the ECHO program had a per-patient monthly limit of $2,500

for reimbursement to providers.  On or around 2010, the ECHO program changed this

reimbursement cap to $36,000 per patient per year.  *Compare* 32 C.F.R. § 199.5(f)(3)(i)

(2011) (setting forth $36,000 annual limit) *with* 32 C.F.R. § 199.5(f)(3)(i) (2010) (setting

forth $2,500 monthly limit).

38. ABA therapy is an individualized therapeutic program, which works to address the

behavioral needs of developmentally-disabled individuals, particularly those individuals

diagnosed with autism-spectrum disorders.  *See, e.g.*, "About Behavioral Analysis,"

Behavior Analyst Certification Board ("BACB"), http://bacb.com/index.php?page=2 (last

visited July 25, 2014); BACB Task List, http://www.bacb.com/Downloadfiles/TaskList/
BACB_Fourth_Edition_Task_List.pdf.

39. During the relevant period of time, reimbursable ABA services under the TRICARE
    ECHO program included a periodic evaluation of the beneficiary, development of a
    treatment plan, training of individuals to provide services in accordance with the
    treatment plan, and "hands-on" ABA services when provided by a TRICARE authorized
    provider.  However, TRICARE does not pay for any ABA services when provided by
    individuals who are not TRICARE-authorized providers.  *See* TPM, Chapter 9, § 9.1.

40. As stated by the TPM, only TRICARE-authorized providers may receive reimbursement
    for providing ABA therapy under the ECHO program.  For the purposes of this
    Complaint, Board Certified Behavior Analysts ("BCBA") and Board Certified Assistant
    Behavior Analysts ("BCaBA") accredited by the Behavioral Analyst Certification Board
    ("BACB") are the only providers authorized to receive reimbursement under the ECHO
    program.

41. During the relevant period of time, for a provider to receive reimbursement for ABA
    therapy and services under the ECHO Program, the provider had to sign and execute a
    Letter of Agreement ("LOA") for each beneficiary who was to receive services.

42. Each LOA states that "[t]he services and payments made under this Agreement shall be
    subject to all applicable federal laws and TRICARE rules and regulations."

43. All claims for payment for services relating to ABA therapy are billed under the medical
    billing (or CPT), code "99199."[3]  *See* TPM, Chapter 9, § 9.1.  CPT Code 99199 is a code
    for "unlisted special service, procedure or report."

---

[3]  CPT stands for Current Procedural Terminology.

44. Because CPT code 99199 is not a specific code referring to a particular medical procedure or service, the CMS-1500 forms submitted for ABA therapy under the ECHO Program do not contain detailed billing information about the services being rendered by the provider.

45. As a result, TRICARE and its contractors, in this case TriWest, only saw the invoices that supported a specific CMS-1500 claim form during audits, or when TRICARE/TriWest had specific questions about a claim.

46. TRICARE relies on the certifications made by providers that they are submitting true and accurate claims for medically necessary services.

## VIII.  FACTS

47. On or about December 3, 2003, Dr. Hatfield signed and executed a Provider Contract with TriWest, TRICARE's authorized contractor for Colorado.  Dr. Hatfield thus became a TRICARE authorized health care services provider entitled to receive reimbursement from TRICARE.

48. Dr. Hatfield's Provider Contract stated that he "shall comply with all policies and procedures set forth the TRICARE Provider Guide," also known as the TRICARE Provider Handbook.

49. On or about April 3, 2006, Dr. Hatfield incorporated Developmental Behavioral Health, Inc., located in Colorado Springs, Colorado.  Dr. Hatfield is the sole owner and agent for DBH.

50. Beginning in 2006, DBH entered into numerous LOAs to participate in the ECHO program.  Each LOA was signed by Dr. Hatfield as the owner of DBH.

51. Each LOA stated that "[t]he services and payments made under this Agreement shall be subject to all applicable federal laws and TRICARE rules and regulations."

52. DBH, under the sole direction and control of Dr. Hatfield, has submitted approximately 500 separate CMS-1500 claims for payment that were not for ABA therapy, but instead billed TRICARE for activities that Dr. Hatfield knew were not allowed under TRICARE rules, regulations, policies, and procedures.  These claims were submitted to TriWest between approximately July 2, 2008, and March 11, 2013.

53. Generally, the activities for which Dr. Hatfield submitted false claims are:

   a. Time spent by DBH employees and/or agents for ABA therapy sessions that were canceled and/or did not actually occur and where no therapy or treatment was rendered;

   b. Time spent by DBH employees and/or agents engaging in administrative functions, for example for conducting billing activities or filling out timesheets; and

   c. Time and money spent by DBH employees and/or agents on purchasing material items such as office supplies, food, and other physical goods which are properly categorized as administrative expenses.

**A.    Defendants' Billing Practices**

54. As the owner of DBH, Dr. Hatfield employed BCBAs and BCaBAs to provide ABA services to the children of TRICARE beneficiaries under the ECHO program.

55. Dr. Hatfield supervised and controlled the activities of the BCBAs and BCaBAs who worked for DBH, even when they were categorized as independent contractors by DBH.

56. Dr. Hatfield was not only the owner of record of DBH, but also at all times responsible for the policies, procedures, and practices relating to claims for payment and billing to TRICARE for the services provided by DBH employees and agents.

57. Under Dr. Hatfield's supervision and control, DBH created a Clinician Procedures Manual ("DBH Manual") that purports to guide DBH employees and agents on policies and procedures relating to DBH.  The DBH Manual lists the following as billable activities:

   a.  Time spent entering mileage and hours into QuickBooks[4] if fifteen or more minutes were spent on this activity; and

   b.  Canceled or "no-show" appointments.

58. On information and belief, Dr. Hatfield put undue pressure on the BCBAs and BCaBAs employed by DBH to bill as many hours as possible to TRICARE for activities he defined as relating to ABA therapy.

59. On information and belief, Dr. Hatfield would issue frequent verbal reminders that BCBAs and BCaBAs should bill as many hours as possible.

60. On information and belief, Dr. Hatfield instituted a policy that BCBAs and BCaBAs must bill between sixty and seventy percent of their working hours to TRICARE.

61. On information and belief, if BCBAs and BCaBAs did not meet this quota and other standards for billing set by Dr. Hatfield, he would reduce their pay and/or vacation time.

62. On information and belief, Dr. Hatfield would become upset at BCBAs and BCaBAs if patients receiving ABA therapy were not billed the maximum amount allowed under the TRICARE ECHO Program (initially $2,500 per month, then $36,000 per year per patient).

---

[4]  *See* Paragraphs 64-66.

63. On information and belief, Dr. Hatfield engaged in the behavior described in this section throughout the relevant period of time.

64. DBH used QuickBooks, an online accounting software program, to track its employees and/or agents' time that was billed to TRICARE.

65. Each DBH employee/agent who engaged in potentially billable activities would login to QuickBooks and enter the following information:

    a.  The date the billable service was provided and/or the date of the entry;

    b.  The name of the beneficiary/patient;

    c.  The insurer the activity was being billed to (*e.g.*, TRICARE ECHO);

    d.  In many cases, a memo or description of the type of service;

    e.  An hourly rate; and

    f.  The time spent on the service in question.

66. Upon information and belief, using QuickBooks' automated software functions, Dr. Hatfield, through his administrative employees, would generate invoices for each beneficiary containing the information described in paragraph 65;

67. Using these invoices, Dr. Hatfield, through his administrative employees, would submit a CMS-1500 form to TRICARE requesting payment for services.

68. TRICARE would then issue payment to DBH based on Dr. Hatfield's submission of CMS-1500 forms.

69. This payment would be disbursed by paper checks paid to the order of DBH.  Each check had a unique number.

70. Dr. Hatfield and/or his administrative staff would then deposit these checks in DBH's corporate bank account.

71. Dr. Hatfield and/or his administrative staff would usually record the unique check number and amount of payment in QuickBooks, and reference the beneficiary/patient for whom services had been paid by TRICARE.

72. DBH submitted and was paid for CMS-1500 claims for payment to TRICARE that were based not on ABA therapy, but on the following activities, as described and recorded by DBH's own employees and/or agents:

    a.  Billing for canceled or "no-show" appointments:

        i.  Cancel/Cancellation

        ii.  No Show

        iii.  Session Cancel

    b.  Billing for administrative tasks (for example, "billing for billing"):

        i.  Billing

        ii.  Scheduling

        iii.  Timesheet

        iv.  Time/Schedule

        v.  Invoice

        vi.  Schedule

        vii.  Payment Logs

        viii.  Response to Attorney for Records

    c.  Billing for material items:

        i.  Materials

        ii.  Supplies

        iii.  Shopping

**B.      Defendants' Knowledge About Improper Claims for Payment**

73. Defendants knew that the activities described in paragraph 72 were not properly billable to TRICARE because:

    a.   Dr. Hatfield is presumed to have knowledge of general TRICARE rules and policies, which clearly and unambiguously prohibit billing TRICARE for the activities described in paragraph 72;

    b.   Dr. Hatfield was provided a copy of the TRICARE Provider Handbook when he became a TRICARE provider, and the TRICARE Provider Handbook provided Dr. Hatfield with notice of the rules, where to find additional information about the rules, as well as specific information about where to find updated versions of the TRICARE Provider Handbook; and

    c.   Dr. Hatfield was informed by TRICARE contractor TriWest that the activities described in paragraph 72 were not billable activities.

74. Dr. Hatfield and DBH submitted approximately 500 individual CMS-1500 claim forms that contained at least one claim for payment for one or more of the activities described in paragraph 72.[5]

75. Table 1 includes a sample of five claims submitted by DBH for ABA therapy that were actually for missed or cancelled appointments:

---

[5]   Plaintiff possesses detailed information for each of the claims submitted.

TABLE 1

| Date of Service (MM/YYYY) | Patient[6] | Description of Service | TRICARE $ Paid |
|---|---|---|---|
| 12/2008 | T.A. | Session cancelled | $156.25 |
| 6/2009 | K.G. | No show | $125.00 |
| 4/2010 | A.H. | No Show/Cancel | $710.00 |
| 9/2011 | A.R. | No Show/No Call | $375.00 |
| 9/2012 | M.D. | Cancelled | $125.00 |

76. Table 2 includes a sample of five claims submitted by DBH for ABA therapy that were actually for billing for administrative tasks (i.e. "billing for billing"):

TABLE 2

| Date of Service (MM/YYYY) | Patient[7] | Description of Service | TRICARE $ Paid |
|---|---|---|---|
| 8/2008 | S.T. | Timesheet, Scheduling | $406.25 |
| 1/2009 | M.D. | Timesheet, Scheduling | $343.75 |
| 12/2009 | C.H. | Billing, Paper, Report | $562.50 |
| 1/2010 | L.M. | Timesheet, invoices, billing | $500.00 |
| 8/2010 | R.C. | Timesheet, Payment Logs | $93.75 |

---

[6]  To protect the personally identifiable health care information of these individuals, their names have not been provided in this Complaint.
[7]  To protect the personally identifiable health care information of these individuals, their names have not been provided in this Complaint.

77. Table 3 includes a sample of five claims submitted by DBH for ABA therapy that were actually for billing for material items:

TABLE 3

| Date of Service (MM/YYYY) | Patient[8] | Description of Service | TRICARE $ Paid |
|---|---|---|---|
| 7/2008 | J.P. | Prep materials | $312.50 |
| 6/2009 | C.P. | Prep materials | $375.00 |
| 10/2011 | J.H. | Food items | $62.50 |
| 9/2012 | M.B. | Develop materials | $125.00 |
| 2/2013 | C.K. | Program materials | $125.00 |

78. The "description of service" listed in the tables in Paragraphs 75, 76, and 77 was recorded in QuickBooks as billable time that was later submitted as part of a claim for payment to TRICARE.

79. On information and belief, at least nineteen different DBH employees and/or agents recorded the description of service described in the tables in Paragraphs 75, 76, and 77, which demonstrates that improper billing practices were a company-wide practice and not limited to any particular individual.

80. Defendants submitted approximately 500 claims that contained at least one false or fraudulent claim for payment, and were paid by approximately $86,000 by TRICARE for these claims.

## I.      CLAIMS FOR RELIEF

### First Cause of Action - False Claims Act, 31 U.S.C. § 3729(a)

81. The United States incorporates by reference paragraphs 1 through 80.

---

[8]  To protect the personally identifiable health care information of these individuals, their names have not been provided in this Complaint.

82. Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to the United States through the TRICARE program in violation of 31 U.S.C. § 3729(a)(1)(A).

83. Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

84. As a result of these false or fraudulent claims made and/or caused to be made by Defendants, the United States suffered damages and is therefore entitled to treble damages under the FCA, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

85. Here, each violation is each CMS-1500 claim form submitted to TRICARE.  Therefore, Defendants are subject to a civil penalty for each CMS-1500 claim form submitted to and paid by TRICARE.

86. Defendants are jointly and severally liable in an amount not less than $1.2 million, but in an amount to be proven at trial.

## Second Cause of Action - Equitable Relief

87. The United States incorporates by reference paragraphs 1 through 85.

88. The United States paid Defendants through the TRICARE program for claims which had been submitted for services that were not properly payable.

89. The false representations and records made by Defendants concerning the performance of services that were not properly payable under TRICARE rules and regulations were material to the United States' determination to reimburse Defendants for those services.

90. Defendants received improper profits by submitting claims to TRICARE for services that were not properly payable.

91. As a result of the acts set forth above, Defendants were unjustly enriched, Defendants were paid by mistake, and the United States is entitled to disgorgement, in an amount to be determined, which, in equity, should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that judgment be entered in its favor and against Defendants as follows:

a. On the First Cause of Action under the False Claims Act, for the amount of the United States' damages, trebled as required by law, plus civil penalties as required by law;

b. On the Second Cause of Action for equitable relief, for the amount of the United States' damages and/or amount by which Defendants were unjustly enriched, paid by mistake, or received improper profits, or by which Defendant retained illegally obtained moneys, plus interest;

c. On all counts for the costs of this action, and such other relief to which the United States may be entitled.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial.

Respectfully submitted this 9th day of September, 2014.

JOHN F. WALSH
United States Attorney

s/ Marcy E. Cook
Marcy E. Cook
Zeyen J. Wu
Assistant United States Attorneys
1225 Seventeenth Street, Suite 700
Denver, Colorado  80202
Telephone:  (303) 454-0100
Fax: (303) 454-0404
E-mail: marcy.cook@usdoj.gov
          zeyen.wu@usdoj.gov

Counsel for the United States